[Cite as *Pahl v. Haugh*, 2013-Ohio-4106.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

BRENT J. PAHL,

    PLAINTIFF-APPELLANT,          CASE NO.  5-12-26

    v.

ELIZABETH HAUGH,           O P I N I O N

    DEFENDANT-APPELLEE.

Appeal from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 20940287

Judgment Reversed and Cause Remanded

Date of Decision:   September 23, 2013

APPEARANCES:

    *John C. Filkins* for Appellant

    *Elizabeth K. Haugh,* Appellee

**WILLAMOWSKI, J**.

{¶1} Plaintiff-Appellant, Brent J. Pahl, ("Brent" or "Father"), appeals the judgment of the Hancock County Court of Common Pleas, Juvenile Division, denying his motion for reallocation of parental rights and responsibilities, in which he claimed that it was no longer in the best interest of the child for the Defendant-Appellee, Elizabeth K. Haugh ("Elizabeth" or "Mother") to continue as the residential parent of the parties' daughter. On appeal, Brent contends that the trial court erred in denying his motion to name him as the residential parent and when it overruled his objections to the Magistrate's Decision before the court reporter had the opportunity to transcribe and file the trial transcripts. For the reasons set forth below, the judgment is reversed and remanded.

{¶2} Brent and Elizabeth are the parents of a young daughter, Vaeda, who was born in September 2008. The parties were never married, although they had been in a long-term relationship and had resided together in Brent's home on Center Street in Findlay, Ohio, along with Elizabeth's daughter from a previous relationship, Brooklyn. Brent was the named the father of Vaeda on the birth certificate.

{¶3} In August of 2009, Brent filed a complaint to establish parentage. Shortly thereafter, Elizabeth moved out of Brent's home, along with her two daughters. On September 23, 2009, Elizabeth filed a motion for temporary orders,

requesting that she be designated the residential parent and requesting that Brent pay child support. Due to the animosity between the parties after their separation, the trial court ordered both parties to adhere to mutual restraining orders. After a hearing, the magistrate designated Elizabeth as the temporary residential parent, granted Brent parenting time, and ordered him to pay child support. The trial court's Temporary Orders on this matter were filed February 9, 2010. Brent also filed a motion to be designated the residential parent and legal custodian of Vaeda.

{¶4} After a two-day hearing, the magistrate issued her decision on the final orders in March of 2010. The magistrate recommended that it was in the best interest of the parties' child for Elizabeth to be designated the residential parent and legal custodian and for Brent to be given regular visitation time as established in the temporary orders. Brent was also ordered to pay child support in the amount of $290.13 per month, and provisions for visitation and insurance were designated. Brent's objections to the magistrate's decision were overruled and the trial court adopted and incorporated the magistrate's decision in its September 7, 2010 Judgment Entry.

{¶5} Brent appealed the juvenile court's decision. *See Pahl v. Haugh*, 3d Dist. No. 5-10-27, 2011-Ohio-1302 ("*Paul v. Haugh I*"). In that first appeal, Brent asserted that the trial court erred when it failed to designate him as the residential parent. He claimed that the trial court overlooked the fact that he was Vaeda's

primary caretaker during her first year of life and he also alleged that testimony before the trial court demonstrated that Elizabeth had a history of depression and alcohol abuse which made her an unsuitable choice to be named Vaeda's residential parent and legal custodian. *Id.* at ¶ 11. Brent also raised errors concerning the amount of parenting time he was given and with the child support calculations. *Id.* at ¶ 10.

{¶6} Upon review, this Court found that the record contained competent, credible evidence to support the juvenile court's decision. *Id.* at ¶ 24. Our review of the testimony and evidence in the record at that time indicated the following.

> **Of particular importance to the magistrate was consideration of the parent more likely to honor and facilitate court-approved parenting time rights or visitation or companionship rights. Upon observing the demeanor and attitude of both parties in court, as well as each party's express statements regarding the other's parenting abilities, the magistrate concluded that of the two, Elizabeth would be more likely to honor and facilitate visitation rights approved by the court. Specifically, the magistrate noted that from "[Brent's] affect in Court it should be found that he has anger issues." \* \* \***

> **With regard to the allocation of parental rights, the testimony demonstrated that Brent was initially steadfast in his position that Elizabeth should have no contact with Vaeda and that he would discourage Vaeda's relationship with Elizabeth until she was at least no longer an infant. However, after being further questioned on this issue, Brent begrudgingly conceded that he would permit Elizabeth to have contact with Vaeda, if he was ordered to by the court.**

> **\* \* \* Brent made allegations that Vaeda was not safe in Elizabeth's care. However, Brent admitted that he had no**

> **contact with Elizabeth since she moved out of his house months earlier due to the parties' use of Elizabeth's grandmother as the go-between for exchanging custody of Vaeda, which also served to alleviate the necessity of having to interact with one another. Accordingly, Brent acknowledged that he had no personal knowledge of Vaeda's situation under Elizabeth's care since the separation—i.e. whether her new home was safe or whether Vaeda's needs were adequately being met by Elizabeth. * * ***
>
> **To the contrary, Elizabeth's testimony demonstrated that, even though she had no contact with Brent, she believed it would be in Vaeda's best interest to have both parents involved in her life. Elizabeth admitted that she believed Brent is a good father to Vaeda, however, her primary concern with Brent as a parent were his "states of rage" and "anger issues."**

*Id.* at ¶¶ 15-19.

{¶7} In *Paul v. Haugh I*, Brent criticized Elizabeth regarding what he characterized as her "infidelities" and "belligerent" behavior, which he attributed to her alleged chronic alcohol abuse. *Id.* at ¶ 16. However, Elizabeth denied having a drinking problem and being unfaithful to Brent. *Id.* At that time, we found that "the record is devoid of any credible evidence substantiating Brent's allegations" and we affirmed the decision of the juvenile court naming Elizabeth as the custodial and residential parent. *Id.*

{¶8} Subsequently, on May 20, 2011, Brent filed a *pro se* motion to change custody, visitation, and support, alleging that Elizabeth was in the Hancock County jail "pending trial and conviction of seven charges since the last custody

hearing."[1]  After several continuances, a three-day hearing on all pending motions was held on December 20, 2011, January 18, 2012, and January 26, 2012.

{¶9} At trial, Brent offered exhibits and the testimony of numerous witnesses to demonstrate that there had been a significant change of circumstances and that it would be in the child's best interest for Brent to be named the residential parent.  The testimony showed that since the trial court's last decision in September 2010, the following had occurred:  Elizabeth had voluntarily quit her previous job (paying $14.13/hour) and now worked at Sears (for $7.40 per hour); she had moved three or four times and was currently living with her boyfriend, Steve Wellman; that the police had been called numerous times for incidents involving domestic violence and intoxication; that Elizabeth had been convicted of three OVI offenses and one count of child endangerment; that she had continued to drive after her license had been suspended; that she had been ordered to attend rehabilitation and had been sentenced to jail; and that she had repeatedly violated the terms of her probation.

{¶10} At the hearings, four police officers testified that they had responded to calls of domestic violence, intoxication, theft, and other issues involving Elizabeth and her boyfriend, Steven Wellman ("Wellman" or "boyfriend").  Since the last magistrate's decision was issued in this case, on March 24, 2010, there

---

[1] Brent eventually retained his prior counsel to represent him throughout the remainder of the proceedings and this appeal.  Both parties were represented by their original attorneys during the hearings in Juvenile Court and during the proceedings below.

was evidence in the record that Elizabeth had contact with law enforcement officers on June 27, 2010, July 31, 2010, August 1, 2010, November 25, 2010, December 11, 2010, December 28, 2010, April 10, 2011, April 28, 2011, July 28, 2011, August 22, 2011, and September 22, 2011. The four officers provided testimony concerning the many of the incidents, including the following.

{¶11} Officer Shane Leeth testified that on July 31, 2010, Wellman told him that Elizabeth had taken his vehicle without permission, and that she was intoxicated. Tr. 19-23. The police report indicated Elizabeth was currently under an Administrative License Suspension ("ALS"). Pl. Ex. A. Elizabeth told the officer that Wellman had struck her in the back while the two of them were in a vehicle. *Id.*

{¶12} Officer Marsha Hill testified that on November 25, 2010, Elizabeth's mother called law enforcement because she was worried about Elizabeth's safety as a result of concerns over alleged suicide threats. Tr. 89. The officer took Elizabeth to Blanchard Valley Hospital for prescreening to check her mental state. Tr. 95-97.

{¶13} Deputy Shane Heckman testified that on April 28, 2011, Wellman called the police because Elizabeth had arrived at his house at 7:45 a.m., extremely intoxicated and refused to leave his home (they weren't living together at that

time).[2]  Pl. Ex. B.  Wellman reported that when he attempted to speak with her, she became irate and started screaming at him and attempted to punch and kick him.  *Id.*  The officer observed Elizabeth screaming at Wellman and his friend, and observed that Elizabeth was intoxicated and very irate and "appeared to have a hard time standing up and fell back to the couch several times."  *Id.*  Elizabeth reported that Wellman grabbed her by the hair and ripped her off the couch.  The officer also observed that Elizabeth's face was swollen, which she said was from a prior incident with Wellman.  *Id.*  Elizabeth denied she had been drinking even though she "was very belligerent throughout the conversation speaking in a loud slurred speech."  *Id.*  The police officer's report further indicated that, at the time of this incident, Elizabeth was on house arrest at her own residence, and that she was under orders to not consume alcoholic beverages.  *Id.*

{¶14} Deputy Barry Turner testified that on August 22, 2011, police responded to a 9-1-1 hang-up at Wellman's residence.  Elizabeth stated that she had moved into his residence about two months ago, and over the past month the two had been having verbal arguments.  She reported that she was trying to finish painting a bedroom upstairs for her children because "she has to go to jail for sixty days soon from a past incident and her children will be staying with [Wellman]."  Pl. Ex. D.  Elizabeth said that nothing "physical" happened between the two of

---

[2] When the officer asked Wellman if they were boyfriend/girlfriend, the officer's report stated that "Steve said no, they 'just fuck sometimes.' * * * Steve said he is not Elizabeth's boyfriend because he thinks she is crazy.  Steve said he has been 'fucking' Elizabeth since October of last year." (Pl. Ex. B)

them, "just the normal pushing that always happens between the two of them." *Id.* When the police officer inquired whether she was sure she wanted to stay with Wellman, "she stated that she has to because she will be going to jail soon and her children need to stay there." *Id.* When the officer inquired whether she had family that could take care of her children while she was away, "she stated that she did not." *Id.*

{¶15} Upon cross examination, Elizabeth's attorney did establish that Vaeda was not present at the time that the police were called for most of the above incidents, except for one time. That incident occurred on August 1, 2010, when Elizabeth called the police as a result of her claim that Wellman was threatening to "beat her ass." Tr. 84, Pl. Ex. F. When police arrived, Wellman was intoxicated and he represented that Elizabeth had assaulted him. Ex. F. When the officer spoke with "an intoxicated Elizabeth," she stated that Wellman showed up at her residence and was screaming in her windows. "She advised [that] he woke and scared both of her children." *Id.*

{¶16} Brent testified that he was 41 years old, he had lived in his home at 508 Center Street for twenty years, and that he provided a good environment for Vaeda. Tr. 319. Brent's home is next door to Donna Krugh, who is Elizabeth's grandmother and Vaeda's great-grandmother ("the Grandmother"). The Grandmother provides considerable baby-sitting services for Elizabeth, and

watches Vaeda when Elizabeth is working. Visitation exchanges for Vaeda also take place at the Grandmother's home, and whatever communication that takes place between the parties occurs via the Grandmother, as Brent and Elizabeth do not speak to each other directly. Brent testified that he does have regular interaction with the Grandmother and discusses what Vaeda has done during the day, what she's eaten, what she's played with, how she's feeling, etc. Tr. 345-46.

{¶17} Brent acknowledged that he does not communicate with Elizabeth, but claims that he has concerns about speaking with her or being in her presence because he claims that she filed a false police report against him during the previous custody proceedings and obtained a CPO, and feared she might do so again. Tr. 347-48. He claims she lied and told police that he broke into her home and beat her, although charges were never filed and the CPO was dismissed. Tr. 348. Brent also testified that Elizabeth stole his dog twice, and tried to cover up starving his dog. Tr. 354, 359. Elizabeth was convicted of petty theft and obstruction of justice in relation to the incident with the dog. Tr. 359-61. He testified that he felt it was best to limit his contact with her because he did not know what she would do in the future, and he was afraid of being "set up." Tr. 364. However, he testified that he wouldn't have a problem communicating directly with Elizabeth concerning matters relating to Vaeda's welfare in the future "after Vaeda's placed in my home safely." Tr. 390-94.

{¶18} Brent further testified he had concerns about Vaeda's safety when she is with Elizabeth "because she gets intoxicated to a level in which she does not know what she is doing." Tr. 372. He has seen her drive with the children in the car when she should not have been driving because of the license suspensions. Brent worries about Vaeda being in a car with Elizabeth and fears that she will "get my kid killed and not even know she did it." Tr. 371.

{¶19} Brent stated that he has seldom missed a visitation with Vaeda, except when he was called to work. However, his employment and work schedule had changed since the previous visitation orders were established. He testified that his mother would be available to watch Vaeda when he worked, if he were to have custody. Besides his mother, he also has his father and stepmother, sister, stepbrother and lots of friends in the area, and they all have good relationships with Vaeda and help him out when needed.

{¶20} On cross examination, Brent admitted that if he were granted custody of Vaeda, he would prefer that the court would order visitation that would be "as limited as possible," i.e., "supervised." Tr. 400-402. However, he denied that he himself would limit Vaeda's time with Elizabeth, and claimed that he would be better able to facilitate a relation between Vaeda and Elizabeth if he had custody. Tr. 381.

**{¶21}** Brent testified that he loves Vaeda and would be the better parent because there was not a safety issue with Vaeda being in his home. Tr. 381. "She's my friend. She's my child. I mean, it's that easy. We play. We run around the table. She rides a big wheel in the basement. * * * I'd love to be able to get her in gymnastics. I've got a lot of plans for her." *Id.*

**{¶22}** Brent also testified that he had a good relationship with Vaeda's half-sister Brooklyn, as she had lived in his home for six years and he would continue to foster that relationship with Vaeda and Brooklyn. Tr. 379. He testified that Brooklyn is often at the Grandmother's home and he asks her all the time if she can come over; that she was included in going to the swimming pool every weekend during the summer; that he gives Brooklyn birthday and Christmas presents; and that he would make sure that the girls had plenty of time to visit and see each other if he was awarded custody. Tr. 380.

**{¶23}** When Elizabeth testified, she acknowledged that she had been arrested three times for OVI and that she had a problem with alcohol addiction. Tr. 257, 529. She confirmed that she pled guilty to child endangerment for driving while intoxicated with the children in the car. Tr. 257. However, she testified that she had attended rehab at St. Rita's, she attended counseling and AA as part of her probation conditions, and that she had not had a drink since April 28, 2011. (Jan. 26, 2012, Tr. 529.

**{¶24}** Elizabeth also acknowledged the incidents in the police reports, including the most recent on September 22, 2011, when she called law enforcement because Wellman was drunk again, and advised them that he was mad, screaming, throwing things and had her on the floor by the throat again, and that she had to crawl out of the living room window in order to get away. Tr. 265. She also advised the police that Wellman had a stolen handgun located at the residence. *Id.* Elizabeth still testified that she believed it was in the best interest of the children that they reside with her at Wellman's residence "as long as he's sober." Tr. 270. However, when questioned as to whether "there had been time periods in your relationship with Mr. Wellman where you felt that he was sober," Elizabeth's reply was, "Not really." *Id.*

**{¶25}** She also admitted that she had not told Brent that she was in jail and rehab, nor did she offer him the opportunity to take care of Vaeda during that time. She acknowledged that she still had sixty-days of jail time to serve in Marion, but she believed that she might be able to serve this time at home with an ankle monitor. Tr. 533. She testified that she would be opposed to Vaeda residing primarily with her father if she did have to serve her time in the Marion jail. Tr. 279. Elizabeth claimed that Brent called her names in front of Vaeda and she was afraid he would say bad things about her, although this was denied by Brent. Tr. 510, 534, 592.

{¶26} Elizabeth testified that she was a good mother, and she showed pictures of Vaeda's and Brooklyn's decorated room in Wellman's home, and discussed how she often does learning and other play activities with Vaeda. She testified, "That little girl is my life. We do everything together."

{¶27} Elizabeth testified that, although she has concerns about Brent's parenting, she does take steps to facilitate Brent's relationship with Vaeda. Tr. 539. She described how she took Vaeda shopping so that she could buy a Christmas present for her father. Tr. 540. She further testified:

> **I do all kinds of things. She talks about her dad all the time. All the time. Everything is my daddy this, my daddy that. I don't say things about him. I encourage her to continue with her dad. I think they need to have a strong, healthy relationship.**

Tr. 539.

{¶28} Steve Wellman testified that he met Elizabeth in 2010, and that she and her two children had lived with him since the latter part of 2011, right after she was released from jail and rehabilitation. Tr. 191-192. When questioned about the numerous police calls, many of which were made by Wellman, he had difficulty remembering. He did acknowledge that he had charges "pending" against him from a September 22, 2011, incident in which it was alleged he had a Python 357 Magnum in the home, but that the matter was "being disputed at this point" and was "not resolved." Tr. 206-207. Wellman acknowledged that he was an alcoholic, and that he had consumed alcohol within the past 12 months. Tr.

209. However, he testified that he was not currently drinking, although he was not in any program or counseling for his alcoholism. Tr. 230. He claims that Elizabeth had given him an ultimatum of no more drinking. Tr. 236.

{¶29} Wellman also stated that he had not observed Elizabeth consume alcohol in the past 12 months. Dec. 20, 2011, Tr. 209. He explains the police reports he made that she was intoxicated were the result of him being a "jerk" and being "vindictive" and "trying to get her into trouble." *Id.* He claimed that he lied to law enforcement about her intoxication in order to get her into trouble. *Id.* at 210.

{¶30} Wellman denied that he was aware that she still had to serve 60 days in jail or that she wanted him to watch the children for her during this time. Tr. 215. He testified that Elizabeth was a good mother, that she spent time playing with and teaching her daughters, and that the daughters seemed to be happy and to be doing well.

{¶31} The magistrate's decision was filed on March 2, 2012. The magistrate found that there had been a change of circumstances that had a material effect upon the child, but recommended that it was not in the child's best interests to grant Brent's motion and name him as the custodial parent.

> **The Court should find that it is not in the best interests of the child to grant [Brent's] request to grant him custody of Vaeda. [Elizabeth's] bad parenting is intermittent while [Brent's] bad parenting is consistent and ongoing. Furthermore, [Elizabeth]**

**will continue to allow a relationship to exist between [Brent] and Vaeda. [Brent's] conduct throughout this case and while in the courtroom indicate that he will continue to allow his hatred for [Elizabeth] to impede Vaeda's relationship with her mother. To grant [Brent's] request would be to essentially terminate Vaeda's relationship with her mother. Accordingly, the Magistrate cannot find that it would be in the child's best interests to grant [Brent's] request for custody.**

Mag. Dec., 13. The magistrate also recommended denying Brent's motions to change visitation and modify child support.

{¶32} Brent filed timely preliminary objections, and on April 11, 2012, the trial court granted his leave for permission for an extension of time to file supplemental objections after the transcript of proceedings had been filed. However, Brent did not timely request an extension of time in which to file the transcript and the trial court dismissed his objections on April 17, 2012, after Elizabeth had filed a motion to dismiss the objections on April 16. The trial court denied his motion for reconsideration and it denied his June 29, 2012 "Motion to Set Aside the Judgment."[3] Although Brent later filed the transcripts on June 15, the trial court did not consider them, nor did it rule on his supplemental objections which were filed 14 days after the transcripts pursuant to the trial court's April 11 amended order. (See further detailed discussion of this matter in relation to the second assignment of error, below.)

---

[3] Brent's motion was captioned "Motion to Set Aside the Judgment," even though he was referring to an interlocutory order.

{¶33} On August 6, 2012, the trial court issued a one-page judgment entry and orders stating that it approved, adopted and incorporated the findings of fact and conclusions of law contained in the magistrate's decision in full, and ordered and decreed that Brent's request for custody was denied, along with his motion to change visitation and child support.

{¶34} It is from this decision that Brent raises this appeal. Elizabeth, who is now *pro se*, did not file an appellee's brief. Pursuant to App.R. 18(C), "[i]f an appellee fails to file the appellee's brief, * * * the appellee will not be heard at oral argument except by permission of the court * * * and in determining the appeal, the court may accept the appellant's statement of the facts and issues as correct and reverse the judgment if appellant's brief reasonably appears to sustain such action."

{¶35} Brent presents the following two assignments of error for our review.

### First Assignment of Error

**The trial court erred as a result of its failure to identify [the Father] as the residential parent.**

### Second Assignment of Error

**The trial court erred as a result of its refusal to consider [the Father's] objections to the Magistrate's Decision after [the Father] paid for and filed the transcript of proceedings.**

{¶36} In order to facilitate our review and discussion, we elect to address the assignments of error in reverse order.

*Second Assignment of Error*

**{¶37}** In the second assignment of error, Brent maintains that the trial court erred when it summarily dismissed his preliminary objections without actually ruling on them. He argues that the trial court erred when it did not allow him a reasonable opportunity to obtain the transcripts, or to respond to Elizabeth's motion to dismiss. He contends that the trial court abused its discretion when it denied him an extension of time in order to have the transcripts prepared and to reconsider its decision to dismiss his objections when it denied his "Motion to Set Aside Judgment."

**{¶38}** The magistrate filed her decision on March 2, 2012. Twelve days later, on March 14th, Brent's attorney timely filed Preliminary Objections to the Magistrate's Decision,[4] along with a Motion for Extension of Time to File Supplemental Objections, stating that he needed time to obtain the transcript of proceedings for the three days of hearings, and that these transcripts were necessary in order to present his objections. On April 11, 2012, the trial court granted the motion.[5]

---

[4] The Preliminary Objections merely stated that (1) the Magistrate's Decision was against the weight of the evidence; (2) the Magistrate failed to properly apply to the law to the facts as established; (3) the Magistrate erred as a result of not designating Brent as the residential parent; and (4) the Magistrate erred in ordering Brent to pay child support.

[5] This was actually an "Amended" Judgment Entry. The first judgment entry, signed and filed by the trial court on March 19, 2012, stated that "Plaintiff's Attorney shall have a period of fourteen (14) days in which to file his supplemental objections * * *." The Amended J.E. stated that "Plaintiff's Attorney shall have a period of fourteen (14) days *after the filing of the transcripts* in which to file his supplemental objections * * *." (Emphasis added.)

{¶39} Six days later, on April 17, 2012, the trial court filed a judgment entry dismissing Brent's objections due to his failure to file a transcript within the "40 day period" as required by Juv.R. 40 and the local Hancock County Juvenile Court Rule 28(D)(2). Apr. 17, 2012 J.E. This judgment entry was filed in response to Elizabeth's "Motion to Dismiss" filed the on the previous day. Elizabeth's motion claimed that Brent's objections were not timely prepared and that the transcript was not timely prepared and he had missed the extension deadline. In her Motion to Dismiss, Elizabeth's attorney represented that the court reporter had "returned the disk to the court because she was not paid." Apr. 16, 2012 Mtn. to Dismiss Objections. The trial court immediately granted Elizabeth's motion, without allowing Brent an opportunity to respond. The trial court stated that "[t]he Plaintiff, although granted an extension to file objections, has never requested nor been granted a request to extend the time to file a transcript. The time requirement has run and no transcript has been filed in this case." Apr. 17, 2012 J.E.

{¶40} On April 26, 2012, Brent's attorney filed a Motion for Extension of Time to Complete Transcription and for Reconsideration of the April 17, 2012, Judgment Entry Dismissing his objections. In his motion, Brent's attorney stated that Elizabeth's motion "was not accurate in its depiction of the circumstances surrounding the preparation of the transcript," that Brent wished to pursue his

objections, and that his request for an additional 40 days in which to complete the transcription would not prejudice the Defendant. Attached to, and incorporated into the motion was the affidavit of the court reporter stating that she had been contacted by Brent's counsel on March 12th, and she provided him an estimate on March 14th. She did return the CDs to the court after giving her estimate, but that was her usual practice. On April 4th Brent's counsel contacted her and indicated that the deposit for the transcription would be delivered on April 6, which it was. On April 11, she received the court order indicating that Brent's attorney had 14 days "after" the filing of the transcript to file objections, and was told that she was to proceed with the transcript as earlier discussed.[6] Her affidavit stated that she needed additional time to prepare the transcript due to the length of the hearings and a pending permanent custody appeal transcript that she was preparing. Apr. 27, 2012, Plaintiff's Mtn.

{¶41} On May 4, 2012, the trial court denied the motion for extension of time and for reconsideration. The trial court stated that:

> **[Brent], although granted an extension to file objections, has never been granted a request to extend the time to file a transcript. Up until the point of the filing of his motion on April 27, 2012, Plaintiff never requested an extension of the transcript filing deadline. The time requirement has run and no transcript has been filed in this case.**

---

[6] The court reporter's affidavit also stated that when she received the original March 19th order, she called the attorney's office and indicated that she could not have the transcript completed "in 14 days" due to the length of the hearings and a pending permanent custody appeal transcript that she was preparing.

-20-

May 4, 2012 J.E.

**{¶42}** On June 15, 2012, the three-volumes of transcripts were filed for the record. On June 29, 2012, Brent filed his detailed supplemental objections, pursuant to the Court's prior order granting him 14 days from the filing of the transcripts. Brent simultaneously filed a motion asking the trial court to set aside the judgment of May 4, 2012; to approve the filing of the transcripts; and, to rule upon the supplemental objections. Brent stated that his motion to set aside the May 4, 2012 Judgment Entry "was predicated upon Civ.R. 60(B)," whereupon a court "may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; * * *." He stated that the trial court's dismissal was based upon an inaccurate depiction of the circumstances surrounding the preparation of the transcript presented by Elizabeth's counsel, and that the court reporter's affidavit clearly established that he was proceeding with the transcription of the hearing in order to file his supplemental objections as to why the trial court erred in naming Elizabeth as the residential and custodial parent.

**{¶43}** On July 19, 2012, the trial court denied Brent's motion to set aside the judgment denying an extension of time. In its decision, the trial court noted that the time periods for the filing of a transcript under Civ.R. 53(D)(3)(b)(iii) and Hancock County Juvenile Rules 28(D)(1)(2) "are at odds with each other as to

how long one has to file a transcript of the hearings upon which objections are based," and acknowledged that the April 17, 2012, dismissal "may or may not have been premature" under the Local Juvenile Rules. However, in any case, it found that Brent's motion for extension of time to file the transcript was still outside of the time limits of the "more lenient" Local Juvenile Rules (by three days). Further, the court stated that, even if its original decision was premature, it reconsidered and ratified it on May 4, 2012. Jul. 19, 2012 J.E.

{¶44} Thereafter, on August 6, 2012, the trial court filed a one-page Judgment Entry and Orders, incorporating its previous judgments and entries; approving and incorporating the findings of fact and conclusions of law as contained in the Magistrate's Decision; and denying Brent's motion for a change of custody and a modification of visitation and child support.

{¶45} A trial court will typically be allotted great discretion in the management of the cases on its docket. *See, e.g.*, *In re Disqualification of Sutula*, 105 Ohio St.3d 1237, 2004-Ohio-7351 ¶ 4. Likewise, it is within a trial court's discretion to decide whether or not it will reconsider a ruling or grant a motion for relief from judgment or order. *See Howard v. Catholic Soc. Serv. of Cuyahoga Cty., Inc.*, 70 Ohio St.3d 141 (1994). A reviewing court will not reverse such rulings unless the trial court has abused its discretion. *See, e.g.*, *Shaffer v. Lyme*, 3d Dist. Shelby No. 17-10-23, 2011-Ohio-2204, ¶ 24. The term "abuse of

discretion" implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶46}** Based upon our review of the record, we find there are specific circumstances in this case that when viewed together suggest that the trial court's decision denying reconsideration of its prior decision and refusing to review the transcripts and Brent's supplemental objections was an abuse of discretion.

**{¶47}** First, the record indicates that between the filing of the March 19, 2012 Judgment Entry and the April 11, 2012 Amended Judgment Entry, additional information regarding the delay in the preparation of the transcript was brought to the trial court's attention, which prompted the trial court to amend its prior entry. As previously discussed, these entries granted Brent's counsel additional time to file supplemental objections. The record demonstrates that the March 19, 2012 Judgment Entry, which stated that "Plaintiff's Attorney shall have a period of fourteen (14) days in which to file his supplemental objections" was modified by the subsequent April 11, 2012 Judgment Entry to state "Plaintiff's Attorney shall have a period of fourteen (14) days *after the filing of the transcripts* in which to file his supplemental objections." (Emphasis added).

**{¶48}** Second, in the affidavit filed by Brent's counsel on April 26, 2012, the court reporter specifically stated that on April 5, 2012, after confirmation from Brent's counsel that the deposit was forthcoming, she reviewed the March 19,

2012 Judgment Entry and notified Brent's counsel that she would be unable to complete the transcript in the 14 day timeframe mentioned in the judgment entry. The court reporter further stated that six days later, on April 11, 2012, she received the Amended Judgment Entry, which granted a new extension of time for supplemental objections—the timeframe for which set forth no date but was based solely upon the filing of the transcript. Thus, the court reporter's affidavit is consistent with the scenario that additional information was given to the trial court regarding the delay in the preparation of the transcript.

{¶49} Both of these facts suggest that it was reasonable for Brent's counsel to believe that he adequately apprised the trial court of the delay in the transcript preparation and, therefore, it was also reasonable for Brent's counsel to rely on the amended judgment entry of April 11, 2012 as implicitly granting him additional time to file the transcript with the court as well as granting him an extension to file his supplemental objections.

{¶50} Third, as acknowledged by the trial court, Juv.R. 40(D) and Hancock County Juvenile Rules 28(D) each set forth a different time requirement for filing the transcript supporting objections. The transcript in this case was due 30 days after Brent filed objections, or on April 13th, according to the Juvenile Rules (as well as Civ.R. 53). However, The Hancock County Rules of Juvenile Court ("Local Juvenile Rules") allow a party *forty* days, so the transcript was not due

until April 23rd under the Local Juvenile Rules. Jul. 19, 2012 J.E. When Elizabeth's attorney filed her motion to dismiss on April 16, and the trial court dismissed the objections on April 17, Brent still had seven and eight days, respectively, in which to timely file the transcripts or to request an extension of time. Therefore, under the Court's own Local Juvenile Rules, the dismissal at that time was in error and premature.

{¶51} Fourth, despite dismissing Brent's objections on April 17, 2012, and overruling his motion for extension of time to complete transcription on May 4, 2012, the record indicates that the trial court did not enter a final order stating it had conducted its independent review of the matter until August 6, 2012. At this point, the transcripts had been filed in the record for almost two months and Brent's supplemental objections had been filed with the court for nearly six weeks. Thus, the trial court had the transcripts at its disposal and neither party would have been prejudiced by the trial court reviewing the transcripts prior to issuing its final order incorporating its previous judgments and entries, and approving and incorporating the findings of fact and conclusions of law as contained in the magistrate's decision. Nor does it appear that any delay caused by the extensions of time sought for either the supplemental objections or the transcript in this case had any prejudicial impact upon the overall time it took the trial court to render its final decision.

{¶52} In sum, due to the lack of clarity regarding the scope of the trial court's order granting Brent's counsel additional time to file supplemental objections based upon the delay in preparing the transcripts, the trial court granting Elizabeth's motion to dismiss Brent's objections prior to the expiration of the 40 day timeframe to file the transcript specified in the local rule, and the trial court's delay in entering a final order on this case until months after the transcripts were filed, all taken together lead us to conclude that the trial court's judgments of April 17, 2012, May 4, 2012, July 19, 2012, and August 6, 2012 amounted to an abuse of discretion. Accordingly, the second assignment of error is sustained.

*First Assignment of Error*

{¶53} Brent claims that the trial court erred when it failed to name him as the residential parent. He asserts that the testimony and evidence established that having Elizabeth as the residential parent subjects his daughter to an environment that is unstable, unsafe, and full of domestic strife, and that there was no evidence to support the magistrate's findings that it would not be in Vaeda's best interest if he was named the residential parent.

{¶54} Because this case is being remanded on procedural grounds, the trial court will need to review the matter and rule on Brent's objections before it decides whether to adopt or reject the magistrate's decision in whole or in part, with or without modification, or take other such action as set forth in Juv.R.

40(D)(4)(b). Therefore, Brent's first assignment of error is not ripe for review at this time until a proper judgment is entered and is therefore rendered moot.

{¶55} Notwithstanding this fact, due to the passing of so much time since the hearings, we would encourage the trial court take advantage of Juv.R. 40(D)(4)(d) allowing that "the court may hear additional evidence * * *," in order to resolve some of the issues in the magistrate's decision. *See also* Juv.R. 40(D)(4)(b). Perhaps this would allow for the opportunity for evidence to be heard from an impartial advocate representing Vaeda's best interest—i.e., through the court utilizing the services of an independent guardian ad litem. Notably, Vaeda was only three-and-a-half years old at the time of the hearings and unable to express her perspective to the court.

{¶56} The appointment of a guardian ad litem may also prove to be especially beneficial under these circumstances given that, except for the testimony of the police officers, all of the evidence before the trial court consisted of the testimony of the parties and their relatives/boyfriend/supporters. As a result, it appears that the magistrate was forced to rely upon a significant amount of speculation and assumption as to whether or not Elizabeth and Wellman would remain sober and obey the law in the future; whether or not the domestic violence and Brent's animosity would affect Vaeda; and whether or not Brent would allow

Vaeda to have visitation and foster a relationship with her mother to form the basis of her decision.

{¶57} Accordingly, having found error prejudicial to the Appellant herein in the particulars assigned and argued in the second assignment of error, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*Judgment Reversed and*
*Cause Remanded*

**ROGERS and SHAW, J.J., concur.**

**/jlr**